EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Plaintiff,

v.

EAGLE IRON WORKS and Local 479,
International Association of Machinists
and Aerospace Workers, Defendants.

Civ. No. 73–116–1.

United States District Court,
S. D. Iowa,
Central Division.

Sept. 27, 1976.

Bruce Elfvin, Trial Atty., and Blance M. Manning, Assistant Regional Attorney, E.E. O.C., Chicago, Ill., for plaintiff.

Paul F. Ahlers, H. Richard Smith and Lance A. Coppock of Ahlers, Cooney, Dorweiler, Haynie & Smith, Arthur C. Hedberg, Jr., Des Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER

STUART, District Judge.

This is a patterns and practices action instituted by the Equal Employment Opportunity Commission (EEOC) pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

as amended. Jurisdiction is invoked under 28 U.S.C. §§ 451, 1343 and 1345. The named defendants are Eagle Iron Works and Local 479, International Association of Machinists and Aerospace Workers. On June 6, 1973 the union filed an answer, but has had little if any part in the lawsuit since that time. The thrust of EEOC's complaint is directed toward actions of Eagle Iron Works.

On October 31, 1968 Eagle Iron Works (Eagle) terminated the employment of Ira Hicks (Hicks). Hicks made a written complaint to the Equal Employment Opportunity Commission (EEOC) by letter dated November 12, 1968 which was filed as a perfected charge.

On December 21, 1971 EEOC found reasonable cause existed to believe Eagle had violated Title VII of the Civil Rights Act of 1964 by discharging Hicks because of his race; by assigning Blacks to the foundry because of their race; and by maintaining a transfer policy which perpetuated the effects of an unlawful hiring policy. Plaintiff mailed a "right to sue" letter to Hicks May 11, 1972. Action was not brought by Hicks until September 7, 1972. It was dismissed on Eagle's motion January 24, 1973 because it had not been commenced within the 90 day period.

On May 23, 1973 EEOC filed this patterns and practices action based on the Hicks claim relying on the March 24, 1972 amendments to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1) and (3).

After numerous motions and extensive discovery the matter reached trial December 8, 1975. EEOC requested transcripts before briefing. Briefing was concluded June 24, 1976. The matter is now before the Court.

### Motion for Summary Judgment

■ A. Defendant in its renewed motion for summary judgment filed October 16, 1975, which was taken under advisement along with the case on the merits, urges that EEOC did not comply with its own regulations in that it failed to give the employer the notice required by 29 C.F.R. § 1601.23, which provides:

Should a respondent fail or refuse to confer with the Commission or its representative, or fail or refuse to make a good faith effort to resolve any dispute, the Commission may terminate its efforts to conciliate the dispute. In such event, the respondent shall be notified promptly in writing, that such efforts have been unsuccessful and will not be resumed except upon the respondent's written request within the time specified in such notice.

The cases have consistently held that compliance with the notice requirements are a prerequisite to the institution of a court action by EEOC. *EEOC v. Raymond Metal Products Co.* (4th Cir., 1976), 530 F.2d 590, 595; *EEOC v. LaClede Gas Co.* (8th Cir., 1976), 530 F.2d 281, 284; *EEOC v. Kimberly–Clark Corp.* (6th Cir., 1975), 511 F.2d 1352, 1360; *EEOC v. Hickey-Mitchell Co.* (8th Cir., 1974), 507 F.2d 944, 948–949; *EEOC v. Raymond Metal Prod. Co.* (D.Md., 1974), 385 F.Supp. 907, 926; *EEOC v. Western Electric Co., Inc.* (E.Md., 1974), 382 F.Supp. 787, 796; *EEOC v. United States Pipe & F. Co.* (N.D.Ala., 1974), 375 F.Supp. 237, 247; *EEOC v. Louisville & Nashville R. Co.* (N.D.Ala., 1974), 368 F.Supp. 633, 638; *EEOC v. Firestone Tire & Rubber Co.* (D.Md., 1973), 366 F.Supp. 273, 276. But see: *EEOC v. Louisville & Nashville R. Co.* (5th Cir., 1974), 505 F.2d 610, 617.

Notice of the charge was given Eagle by EEOC. An investigation was made and EEOC made a determination of reasonable cause. Eagle was notified of such finding and some efforts were made at conciliation. The only correspondence received by a representative of Eagle Iron in any way related to the requirements of § 1601.23 was the letter of April 14, 1972 from Samuel T. Robino, Equal Employment Conciliator to John A. Blanchard, attorney for Eagle, which stated:

As discussed in our most recent conversation of Thursday, April 13, 1972, the charging party in the referenced case has indicated to the Commission he wants his right-to-sue letter so that he may proceed

to seek his relief in the Federal District Court.

The charging party feels that the respondent has received sufficient time in which to communicate an offer in the referenced case.

Although conciliation efforts are unsuccessful at this time, I, as Conciliator for the Commission, am still willing to communicate any offer you desire to the charging party, or to his attorney if he is so represented.

This letter does not satisfy the requirements of 29 C.F.R. § 1601.23, which is intended to afford "even the most uncooperative and recalcitrant respondent the 'right to be told that it has one last chance to attempt conciliation'". However, the Eighth Circuit in *EEOC v. LaClede Gas Co.* (8th Cir., 1976), 530 F.2d 281, 284, made prejudice a condition of dismissal adopting the reasoning of the Fourth Circuit expressed in *Raymond Metal Co.*, supra, 530 F.2d at 596:

The commission's statutory duty to attempt conciliation is among its most essential functions. It is, therefore, important that it follow its own regulations, especially when it intends to cease administrative efforts and resort to the courts. But not every relaxation of an agency's rules merits dismissal. The imposition of this extreme sanction generally depends on whether the party dealing with the agency was prejudiced.

The Eighth Circuit appears to have gone beyond the holding of the Fourth Circuit in *Raymond Metal*. In *LaClede Gas*, it held there was no prejudice to the employer even though the letter from the employer declining to conciliate was written *before* the EEOC letter which was meant to satisfy the requirements of § 1601.23. The Court in *Raymond* emphasized the fact that the actions of the defendant were taken *after* a similar letter was received from EEOC, saying:

Raymond Metal's initial refusal to enter into conciliation discussions does not establish lack of prejudice. The regulation expressly allows even a recalcitrant

respondent one last chance to settle the dispute. [citing *Hickey-Mitchell*] We believe, however, that Raymond Metal's actions *after receiving the commission's letter* show that it was not prejudiced by the commission's failure to state that an opportunity to resume conciliation would be available for a limited time. * * *

Because the commission's letter fairly warned Raymond Metal that suit might be brought and because the company's position *after receipt of the notice* indicated that it had no interest in conciliation, it is apparent that an offer to attempt conciliation at the option of the company would have been futile. (Emphasis supplied)

Supra, 530 F.2d at 596.

Although EEOC made no attempt to comply with Reg. 1601.23 in *Hickey-Mitchell*, the court has difficulty in fitting the holding in *LaClede Gas* within the following philosophical language contained therein:

However, the Commission offers no acceptable justification for its breach of the regulation in this case, and we cannot conclude that the Employer was not prejudiced by it. *The Employer's letter refusing to conciliate is, as we have noted, the event which should have triggered the application of the regulation, not the excuse for ignoring it.* Compliance with the regulation, a last gesture by the Commission of a conciliatory attitude, may well give pause to the most (theretofore) recalcitrant employer, now indubitably faced with expensive and time-consuming litigation, and thus lead to a resolution of these disputes in a congressionally preferred forum. (Emphasis supplied) *Hickey-Mitchell*, supra, 507 F.2d at 948–949.

However, the Court believes that under either case EEOC has not established that failure to comply with Reg. 1601.23 under these facts did not prejudice this defendant. The letter of April 14 leaves the impression that the conciliator is expressing the wishes of the charging party. It not only does not state any intention on the part of the commission to cease efforts at conciliation, it

conveys the idea that the commission itself is still open to negotiations. No time limit was specified. Nothing in the record indicates that Eagle had stated it would not engage in conciliation or that conciliation was at an end. Discussions had taken place the day before the April 14, 1972 letter between Mr. Robino and Mr. Blanchard which Mr. Robino summarized as follows.

6. On April 13, 1972 I spoke with Mr. Blanchard and informed him that Mr. Hicks had requested a right to sue letter. I further advised Mr. Blanchard that I would be willing to take an offer to Mr. Hicks prior to the letter being issued. I also stated that conciliation efforts by the company have not proceeded or progressed in a manner acceptable to the commission. Mr. Blanchard made excuses as to why he had not called the commission to make an offer or further discuss settlement, stating that it was tax time and also one of the other attorneys in his office was out sick and he did not make an offer or indicate when or if one would be forthcoming.

7. On April 14, 1972 I wrote a letter to Mr. Blanchard confirming our conversation of April 13, 1972 and also indicated that although conciliation efforts were unsuccessful at that time that I, on behalf of the commission, was still willing to communicate any offer to the charging party or to his attorney.

Blanchard said nothing to indicate further efforts at conciliation would be useless. Mr. Davis, Eagle's personnel manager, testified that to his knowledge, conciliation efforts never terminated and were open all the time. It may very well be, as the defendant argues, that "the necessity for litigation could have been obviated at tremendous savings in dollars, company time and judicial time had the proper conciliation procedures been followed".

*EEOC v. Kimberly–Clark Corp.* (6th Cir., 1975), 511 F.2d 1352, 1360 is not contrary to the result reached here. It involved various groups of charges. Defendant argues the "Williams group" was not before the court because EEOC did not notify it that conciliation had failed and was terminated before bringing suit as required under 29 C.F.R. § 1601.23.

The Court said that because Kimberly–Clark had been notified that conciliation had failed in Dunavan and Meek group charges:

> Appellees were apprised of the imminence of suit concerning sex discrimination charges prior to appellant's suit. It suffered no significant prejudice by not being notified of the failure of conciliation on the 'Williams Group' of charges as well, since these charges concerned substantially identical issues of company practices.

The Court holds that EEOC has not established that Eagle was not prejudiced by its failure to comply with 29 C.F.R. § 1601.-23, and holds that Eagle was prejudiced by such failure. It was not afforded the one last chance to resolve the dispute by the congressionally approved method of conciliation. EEOC failed to comply substantially with its own regulation. As a result Eagle's motion for summary judgment should be granted on that ground.

B. Defendant also moved for summary judgment on the ground that there was no reasonable cause for EEOC to believe Eagle had violated 42 U.S.C. § 2000e.

In the Court's Memorandum and Order of July 2, 1974 denying defendant's motion for summary judgment, the Court accepted the commission's finding of reasonable cause to believe that an unlawful employment practice had occurred as satisfying the "reasonable cause" pre-requisite to the institution of a suit. The Court refused at that time to examine the factual basis underlying such finding. It pointed out that the trial would be conducted de novo and the Court would be that time determine for itself if a violation of Title VII had occurred, stating:

> If the evidence reveals there was no basis for a finding of reasonable cause, the Court will take this into consideration in assigning the financial burden this lawsuit has imposed on Eagle.

■ At trial plaintiff offered no evidence other than that which was before the Court when the summary judgment motions were ruled upon. EEOC takes the position that a finding of reasonable cause is only a procedural step that must be taken before suit can be commenced and is not subject to judicial review. The Court does not agree. However, the Court does not believe it would now take the position taken two years ago. The assignment of costs does not appear to me now to be the best remedy. Certainly the finding of reasonable cause should not be subject to de novo review. (But see *Smith v. Universal Services, Inc.* (5th Cir., 1972), 454 F.2d 154.) But, a hearing upon the underlying factual information to determine whether the decision was arbitrary and capricious might save the government and the employer immense sums of money and the Court a great deal of time. The procedure might be considered analogous to determine whether there was probable cause for the issuance of a search warrant, or probable cause to bind a person over to the Grand Jury at a preliminary hearing.

However, such a hearing would have made no difference in this particular case because I find that the commission did not act arbitrarily and capriciously in finding reasonable cause in two of the three violations charged. The commission found:

There is reasonable cause to believe that [Eagle Iron] is engaged in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 by discharging Charging Party because of his race, by assigning Negroes, because of their race, to the foundry department, and by maintaining a transfer policy which perpetuates the effects of its unlawful hiring policy.

■ The Court holds that there was no factual basis for finding reasonable cause to believe Ira Hicks was terminated because he was black. He was fired by his black foreman and white superintendent and was replaced by a black worker. The evidence is undisputed that he was fired after an incident which caused the loss of a day's pour from his furnace in the foundry. There is some question as to who was at fault, but there is no question why he was fired.

It follows from this holding that the Court would resolve the factual issue on trial de novo in favor of the employer and find no violation of Title VII by discharging Charging Party because of his race.

The Court believes there was sufficient evidence before the Commission to justify a finding of reasonable cause to believe Eagle violated Title VII;

(1) by assigning Negroes to the foundry because of their race;

(2) by maintaining a transfer policy which perpetuates the effects of the unlawful hiring policies.

The fact that there was a much higher percentage of black employees in the foundry than in the fab shop furnishes a basis for both. However, it is ironical that Hicks' only complaint was not justified and the other factors not complained of, but uncovered in the investigation, have resulted in this lawsuit.

■ Although the ruling in favor of Eagle on its motion for summary judgment because EEOC failed to follow its own regulations concerning conciliation is dispositive of the case, it is appropriate and advisable for the Court to also decide the case on its merits as an alternative decision.

*Decision on the Merits*

Eagle Iron Works is a small manufacturing plant in Des Moines, Iowa employing approximately 250 persons. It consists of a foundry and a fabrication plant (fab shop) and supporting departments. The foundry and the fab shop are separate operations. The foundry produces castings for use in the fab shop's products which are primarily heavy mining and sand and gravel equipment. It also produces castings for third parties.

In the fab shop, Eagle Iron employs a higher percentage of both Blacks and minorities than are represented by their percentage of population in the relevant mar-

ket area. However, a much higher percentage of Blacks is employed in the foundry. The foundry is harder physical work, dirty, hot, and dangerous. A high percentage of its jobs require less skill and education than the jobs in the fab shop. Although some individuals like to work in the foundry, it is not appealing to most people. As a consequence, there is a much greater turnover in the foundry than in the rest of the departments of Eagle Iron Works.

EEOC claims that race is a factor in the initial assignment of a higher percentage of Blacks to the foundry. It also claims that race is a factor in a transfer policy which perpetuates the initial improper assignment. It also claims that race is a factor in the involuntary discharge of Blacks.

In order to establish a prima facie case of discrimination EEOC relies on (1) statistics gathered by it from Eagle's records, (2) an expert's opinion based thereon, and (3) individual examples of alleged discrimination.

There is virtual unanimity on the proposition that the showing of a statistical disparity between the proportion of blacks in the employer's workforce and the proportion of blacks in the relevant labor market makes out a prima facie case of discrimination in violation of Title VII (citations).

*U. S. v. Hazelwood School Dist.* (8th Cir., 1976), 534 F.2d 805, 811.

But statistics must not be accepted uncritically, without careful consideration of all relevant factors, *Logan v. General Fireproofing Company* (4th Cir., 1971), 521 F.2d 881, 888. Complexities and variables require close scrutiny of empirical proof. *Pettway v. American Cast Iron Pipe Company* (5th Cir., 1974), 494 F.2d 211, 231, n. 44.

Eagle attacks the accuracy of the statistics, the methodology by which they were prepared and their sufficiency as a basis for the opinion of the expert, Professor Louis St. Peter. No cases have been called to the Court's attention in which such attacks have been made. These factors must surely affect the sufficiency of the

statistics in establishing a prima facie case and the evidence necessary to overcome the prima facie case.

The reliability of the accumulated figures is questionable. Numerous errors relating to relevant information have occurred. The method used in determining and reporting race, job assignment, nature of discharge (voluntary or involuntary) are suspect. The testimony of defendant's expert Mr. Krishna and defendant's Exhibits O through S show many of them. However, as far as these faults and others relate to the over assignment of Blacks to foundry work, they are not crucial, as it is without dispute that a much higher percentage of Blacks are employed in the foundry than are employed in non-foundry work. The statistics do assume greater importance, however, when they are used as a basis for the expert's opinion that Blacks were assigned to the foundry because of their race.

EEOC did not attempt to take a scientific random sample. The investigation was directed toward identifying and classifying all individuals within the universe or population consisting of all current and former employees of Eagle Iron Works. The effort was not successful. Only 1200 out of 2000 were identified by race. The 250 current employees, were all identified. This means that only about 55% of the former employees were so identified. This racially identified 55% included a much higher percentage of employees from the foundry than it included from the fab shop.

Dr. St. Peter attempted to establish the race of the remaining 800 by comparing the percentage of Blacks *hired during a given period* with the EEOC–1 report of the percentage of Blacks *employed on a date certain*. He theorized that, as the percentages were nearly the same (12% and 12.7%), almost all of the remaining 800 were white. Cross examination disclosed that he did not realize at the time that he was comparing "hires" with total employees on a given date. The problem with such comparison is obvious. Any similarity in the percentage of Blacks hired and the percentage currently employed is purely coincidental. Because

of the more rapid turnover of foundry employees and the fact that a higher percentage of foundry employees are black, it is more likely that similarity of percentages in hires and employees would mean that some of the unidentified employees were black. In other words, the percentage of Blacks hired by Eagle would exceed the percentage of Blacks on the roster of current employees. The Court does not believe there is a factual foundation for Dr. St. Peter's opinion that the unidentified former workers were white.

The Court permitted Dr. St. Peter to opine that an examination of the educational achievement and previous skills of current employees, black or white, working in manual jobs suggests that there is no consistent relationship between these factors and race or between these factors and the job assignment. "Thus, on the basis of the information available, it appears unlikely that the factors of educational achievement and previously acquired skills account for the over assignment of blacks to the foundry."

This broad generalization was arrived at by examining the qualifications of 92 of the 250 current employees as shown on Exhibit 9; obtaining their initial job assignment and race from Exhibit 1; forming a conclusion therefrom and applying it generally to all current and former employees. Exhibit 9 is not a scientifically prepared random sample. It is a list of current production employees, including supervisors, hired by Eagle between January 1, 1963 and December 31, 1972. No tables, work sheets, or computations were presented to support this conclusion. A cursory review of Exhibits 1 and 9 discloses a high percentage of instances in which the job assignment was correlated with education or training and experience.

The lack of a satisfactory basis for such opinion and the obvious willingness of the witness to attribute more authenticity to the statistics than they possessed, cast doubts upon the value of Dr. St. Peter's opinions. The Court will not review the evidence in detail but he attempted to give a haphazard 55% racial identification of former employees more reliability than ordinarily accorded such a low percentage of identified persons by statisticians. He also tried, unsuccessfully, to establish a basis for assuming the racial identity of the remaining 800 as commented on above. He would not concede the presence of possible systematic bias which statisticians seek to eliminate in a nonrandom sampling of a universe. He suggested that a whole population had been identified if the name, but not the race, was known. This is not sound or credible when identity by race is the important fact. The name was of no importance. All EEOC furnished was a nonrandom sampling with built-in bias severely affecting the statistics' credibility and value as the basis of an opinion of a statistician.

The Court is of the opinion that the evidence presented by defendant concerning the reasons for assignment of Blacks to the foundry overcomes and predominates over any prima facie case made by the vulnerable statistics and questionable opinions of the EEOC expert. Even if Professor St. Peter's opinion were based on valid statistics, the other evidence more than overcomes his conclusion.

An employer's avowal of no intent to discriminate because of race should carry little weight in the face of statistics and other evidence clearly indicating the existence of discrimination. However, when such avowal is accompanied by other evidence offering logical explanations for a facially discriminatory assignment, the prima facie case of discrimination is overcome. This is particularly true when the statistics used are not as reliable as one would prefer.

As indicated earlier the Court is of the opinion that Dr. St. Peter did not have sufficient information before him to express an opinion that the overassignment of Blacks to the foundry was made on the basis of race. The statistics had too large a percentage of racially unidentified. The percentage of such unidentified varied greatly between the fab shop and the foundry. His basis for labeling the racially unidentified as white was unsound. His

conclusion that the assignment was based on race was formed on the analysis of the initial assignment of 92 out of 250 present employees from very brief comments concerning the work experience, training, education and race of some of the 92. He presented no evidence or explanation of the method he used to arrive at his conclusion. He did not know the job openings at the time of application and did not know the race of the applicants at the time of the job openings. He conceded this information would have been helpful.

The unchallenged explanations offered by Eagle more than offset an opinion based on such fragmentary evidence and judgmental decisions. The Court was particularly impressed by the knowledgable and logical evidence presented by William Davis, who was hired as personnel director for Eagle after Hicks was discharged. His background and the fact that he has no present connection with Eagle convince the Court that he was objective and impartial in his testimony.

Mr. Davis is black. While in the army, he served as a NAACP investigator in his spare time. He continued to so act after his discharge, although he had full time employment as a salesman. In July, 1968 he came to Des Moines as an on the job training developer under the government's Concentrated Employment Program (CEP). His job was to make contacts with employers to help disadvantaged or hard core unemployed find jobs. He contacted Eagle in this capacity. It agreed to accept applicants from the CEP rolls but elected not to accept government funds for their participation. Eagle was impressed with Mr. Davis and persuaded him to accept a job with them as personnel director commencing February 17, 1969. As personnel manager he interviewed and hired the employees at Eagle after consulting with supervisors. While working he took night classes at Drake University. March 22, 1973 he left Eagle voluntarily for a better job at greater pay with John Deere at Waterloo.

Mr. Davis supported the other evidence that the percentage of black employees in non-foundry jobs exceeded the percentage of black males in the relevant market area. He agreed that a much higher percentage of Blacks worked in the foundry. He attributed this fact to the availability of unskilled and semi-skilled Blacks for the jobs in the foundry and the inability of Eagle, because of its wage and benefit package, to compete with larger, better paying concerns for the much sought after skilled minorities. Eagle advertised for skilled employees as an equal opportunity employer but had few, if any, minority applicants. Davis' conclusion was that the only way Eagle could avoid the appearance of overassignment of Blacks to the foundry would be to discriminate against them by not hiring them for foundry work as it could not successfully compete for skilled Blacks.

Mr. Davis' testimony is supported by other evidence in the case. The Court is convinced that the higher percentage of Blacks in foundry work was not based on discrimination against them because of their race. Rather, it resulted from the availability of Blacks for the type of jobs in the foundry and their unavailability for the higher skilled jobs in the fab shop. Statistics show that Blacks generally are over represented in the lower job classifications throughout industry. This case is entirely different from the *Hazelwood* case where the black applicants for the teaching positions had the same basic qualifications that the school district required and the percentage employed was far less than percentages of Blacks in the relevant market area.

### Transfer Policy

Having found that Eagle did not have a discriminatory initial assignment policy, the court need not consider the transfer policy alleged to perpetuate it. However, a few comments would be appropriate.

Prior to March, 1971, the fab shop was unionized and the foundry was not. Job openings in the fab shop were filled on a qualification and seniority basis within the fab shop by bidding. Jobs in the fab shop were not posted in the foundry and, if they had been, applications could not have been

considered unless the job could not be filled from within the shop. This obviously created barriers to transfers from the foundry to the fab shop. However, there is no evidence of formal efforts to transfer. Mr. Hicks testified he talked to his supervisor about it but he made no application. He was told they needed him in the foundry. A possible explanation is that foundry employees would not apply for jobs they didn't know about or couldn't get.

However, the evidence as to what happened since the foundry was unionized establishes the barriers to transfers did not forestall applications for transfer. Since March 1971, job openings have been posted plantwide, bidding is done on the basis of plantwide seniority dating from the time of hire, not the date the foundry was unionized. In spite of this, there has been little if any bidding for fab jobs from the foundry. This also is understandable because the scale for comparable jobs is the same throughout the plant and there are more top paying jobs in the foundry available through promotion to workers without particular training, skills or education. An unskilled worker in the fab shop would have little chance to bid out of the low paying jobs because of lack of qualification to advance.

For these reasons the Court does not believe that the theoretical possibility of discrimination in transferring did, in fact, constitute or cause discrimination against any particular individual. Since 1971 there has been no barrier, thus no further remedy would be in order for the class, even if the previous situation had in fact barred some applications for transfer.

### Discriminatory Discharge Policy

Although a policy of discriminatory discharge of Blacks was not included in the Commission's decision, it has been raised here. The statistics show that over the years about the same number of Blacks as Whites have received involuntary discharges. These statistics are based on the decisions by the data collector as to which terminations were voluntary or involuntary. In some instances, the decisions were wrong. For instance, death and imprisonment were both listed as "involuntary termination". However, the statistics support a finding that a larger percentage of black than white employees was terminated involuntarily.

The Court cannot find that this finding supports a discriminatory firing policy against Blacks. There are too many variables, unknowns, and other factors to give this bare statistic that much weight. Eagle proved to the Court's satisfaction that all the witnesses offered by EEOC as being discharged because of race were in fact discharged for good cause. The witnesses' testimony appeared to be that of disgruntled discharged employees which colored their testimony and underlaid their unfounded opinions. Eagle's attitude toward its black employees belies any prejudice because of race. It had a black personnel manager; in the absence of the superintendent, a Black, acts as the temporary superintendent of the foundry; the first foremanship ever created in the foundry went to a black; two of four foremen are black and the five top paying jobs in the foundry are held by blacks.

The Court does not wish to leave the impression that it believes Eagle has employed so many Blacks in the foundry over many years because it was motivated by a strong sense of social justice. The foundry offered jobs that unskilled and semi-skilled Blacks can perform at a wage scale they would accept. It has been and is to Eagle's advantage to hire Blacks in the foundry and to treat them fairly. It has done so. The Court believes Eagle has tried, without success, to attract skilled minorities. As they are in high demand under affirmative action programs, it is understandable why Eagle cannot compete with more liberal benefit package of some other employers. It seems unfair that this combination of circumstances should have been the prime cause of this lawsuit and the resultant burden of time and expense it has imposed on Eagle.

The Court is of the strong opinion that this case should never have been instituted and, once commenced, it should not have gone to trial. The Commission made a finding of reasonable cause to believe there was racial discrimination in the face of contrary findings by the Des Moines and Iowa Civil Rights Commissions. (But before § 2000e–5 was amended to require the Commission to "accord substantial weight to such findings".) The action was instituted after Hicks' individual action was dismissed, thus raising many first impression procedural matters and the defenses of the statutes of limitations and res judicata which remain to be resolved by an appellate court.

The Court, by its rulings, made its own contribution toward the perpetuation of this case. The Court believed that EEOC should have the opportunity to press for the goals Congress sought by enacting 42 U.S.C. § 2000e. However, conceding a reasonable cause to investigate the disproportionment assignment of Blacks to the foundry, it should have appeared quite early in the investigation that there was no wage discrimination and that Eagle was offering good paying jobs to persons without salable skills with the opportunity to advance to top paying jobs. The commissioner should have questioned whether a company with a black personnel manager and black leadership in the foundry would be likely to discriminate against Blacks.

The Court does not question the good faith of EEOC or its representatives, but it does question the judgment exercised in maintaining such an adamant position in this case. This type of case is not helpful to the efforts of the Commission to achieve the commendable goal of the elimination of existing discriminatory practices. The enthusiasm toward reaching that goal should be tempered by the realization that there may be good reasons for a situation which might make one suspect racial discrimination.

The Court has given serious thought to the taxation of part of the defense of this action to EEOC but decided against it because it does not believe the action was frivolous, or pursued in bad faith. But, the Court cautions EEOC to be conscious of its great power as an agency of the federal government to impose large financial burdens on small companies called upon to defend charges of this nature. The threat of a long, involved, expensive lawsuit should not be used coercively. Such tactics tarnish the highly desirable goal sought to be achieved.

IT IS HEREBY ORDERED that defendants shall have and recover judgment against the plaintiff for the costs of this case.